<u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the United States Department of Energy and the United States Small Business Administration (the United States), and Wilson Pershing Stevenson III (Defendant) (collectively the Parties) through their authorized representatives.

<u>RECITALS</u>

A.   During the relevant time period, Defendant was the sole owner, operator, and manager of BNL Technical Services, LLC (BNL), a business incorporated in the State of Washington and with its principal place of business in Richland, Washington. BNL primarily provided staff augmentation services to DOE prime contractors at the Hanford Site. BNL also provided staff augmentation services to the VA in the Eastern District of Washington.   At all relevant times, FirstBank was a Federal Deposit Insurance Commission-insured financial institution, and a participating Paycheck Protection Program SBA delegated lender, headquartered in Nashville, Tennessee.

B.   During the relevant time period, BNL had staff augmentation subcontracts with multiple DOE prime contractors. Under the BNL staff augmentation subcontracts with the DOE prime contractors, the hours for each BNL worker for which a DOE prime contractor owed would be directly, and at regular intervals, invoiced pursuant to those contracts and BNL would be fully reimbursed for those workers' hours at the agreed-upon rate, which included not only the workers' actual compensation and benefits, but also overhead costs including BNL's general and administrative expenses. These additional overhead costs in the BNL's staff augmentation subcontract rates indirectly covered the

payroll costs for additional BNL employees. At all relevant times during the existence of BNL's staff augmentation subcontracts, the invoicing for the reimbursable hours of BNL's payroll and other costs continued. Further, BNL was always paid by DOE through its prime contractors for the reimbursable hours of its staff augmentation workers, whether or not those employees were able to work, including during times that the employees were not able to work due to COVID-19 related shutdowns. The process of DOE, through its prime contractors, paying for BNL's staff augmentation payroll based on invoices for reimbursable hours, on a per-worker basis, did not change regardless of whether or not the funds were for hours worked in person at Hanford, for hours worked remotely by, for instance, authorized telework, or for BNL workers who were unable to work but were being maintained in a ready-state as authorized during the COVID-19 pandemic. All such payments to BNL were made using public DOE funds that DOE prime contractors themselves drew down from their respective DOE lines of credit.

    C.    The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) was a federal law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and other certain expenses, through a program referred to as the PPP. Another source of relief provided by the CARES Act was COVID-19 relief funding through the Economic Injury Disaster Loan (EIDL) program. EIDL is an SBA program that provides low-interest funding to small businesses, renters, and homeowners affected by declared disasters. Anther source of relief provided by the CARES Act was provided in Section 3610 of the CARES Act, sometimes

referred to at Hanford, and herein, as "COVID Safety Pay." Section 3610 of the CARES Act generally authorized government agencies to reimburse contractors for paid leave provided to contractor personnel and subcontractors during the COVID-19 national emergency in order to keep the federal government contracting workforce in a ready state during the pandemic.

      D.     In order to obtain a PPP, a qualifying business was required to submit a PPP application signed by an authorized representative of the business. The PPP application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP. In the PPP application, the applicant (through its authorized representative) was required to state, among other things: (a) its average monthly payroll expenses; and (b) its number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. Additionally, the applicant was required to certify that they were in operation as of February 15, 2020. The applicant was also required to certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant," and that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payment, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold be legally liable, such as for charges of fraud." The applicant was also required to certify that the information in the application was true and correct to the best of the applicant's knowledge.

E.     A business's PPP application was received and processed, in the first instance, by a participating lender. If a PPP application was approved, the participating lender funded the PPP using its own monies. Data from the application, including information about the borrower, the total amount of the loan, the listed number of employees, and the gross income amount, was transmitted by the lender to the SBA, an agency of the United States, in the course of processing the loan.

F.     A PPP borrower can repay the loan or can chose to seek forgiveness of the loan from the SBA by making certain representations and certifications. In order to obtain SBA forgiveness of a PPP loan a borrower is required to submit an SBA form 3508 also known as a PPP Loan Forgiveness Application. In the PPP Loan Forgiveness Application, the borrower choses between 8 and 24 weeks from the date of the PPP loan as the covered period for the loan. In the PPP Loan Forgiveness Application, the borrower is required to certify the amount of the PPP Loan proceeds which the borrower used for payroll and other authorized business expenses during the covered period. In order to obtain forgiveness of the entire PPP Loan amount a borrower must have spent at least 60% of the PPP Loan proceeds on payroll costs during the covered period and up to 40% on other authorized business expenses such as mortgage interest payments of the business, lease payments of the business, or utility payments of the business. PPP proceeds used to pay business debts incurred prior to the covered period, which begins on the loan approval date, are not authorized business expenses and therefore are not eligible for SBA forgiveness. Similarly, PPP proceeds used to pay interest accrued on business debts due prior to the covered period are not authorized business expenses and therefore are not eligible for SBA forgiveness.

G. Further, in order for a borrower to obtain SBA forgiveness of a PPP loan the borrower must certify, among other things, the dollar amount for which forgiveness is requested, that the PPP Loan proceeds were used to pay eligible costs during the covered period, that the payroll costs were equal to at least 60% of the forgiveness amount, and that the borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the borrower is requesting forgiveness.

H. In order to obtain an EIDL and advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was the year preceding January 31, 2020. The applicant must also certify that all the information in the application is true and correct to the best of the applicant's knowledge. The amount of an EIDL, if the application is approved, is determined based, in part, on the information provided in the application about employment, revenue, and cost of goods, as set forth above. Any funds issued under an EIDL or advance are issued directly by the SBA. EIDL funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

I. Unlike a PPP Loan, which can be forgiven by the SBA, an EIDL is required to be paid back to the SBA. Consequently, a borrower cannot seek forgiveness of PPP Loan proceeds where the borrower has used those proceeds to pay off any portion of a borrower's EIDL.

J.  At Hanford, DOE applied Section 3610 of the CARES Act, known as "COVID Safety Pay", to contractor and subcontractor employees who could not perform work on a government-owned, government-leased, contractor-owned, or contractor-leased facility or site approved by the federal government for contract performance due to closures or other restrictions, and were unable to telework because their job duties cannot be performed remotely during the pandemic. BNL applied for and received COVID Safety Pay from DOE prime contractors to use for qualifying BNL staff augmentation payroll.

K.  On or about April 13, 2020, despite knowing that BNL was in fact receiving its staff augmentation payroll funds from DOE, through its DOE prime contractors, as well as from the VA, Defendant, on behalf of BNL, signed and submitted an application for PPP No. 44226571-08 for "payroll costs" in the amount of $493,865 to FirstBank, a delegated SBA lender, and to the SBA. This application improperly calculated those payroll costs based on the payroll costs for BNL staff augmentation employees whose payroll was already being fully reimbursed by DOE, through its prime contractors as well as by the VA. On or about April 13, 2020, as a result of and in reliance on the representations and promises made in the PPP Application No. 44226571-08, First Bank approved the PPP in the amount of $493,865.

L.  On or about April 18, 2020, Defendant signed and electronically submitted on behalf of BNL a Borrower Application Form for PPP No. 44226571-08 to First Bank as the participating SBA lender and to the SBA. The application form promised and represented that the PPP funds would be used to retain workers and maintain payroll. The application further promised and represented that Defendant had accurately calculated payroll costs (including amounts required to be excluded from payroll costs), average

6

monthly payroll, and the loan amount requested. A properly signed Borrower Application Form is required to make a determination regarding an applicant's eligibility for financial assistance. The application further represented and certified on its loan application that dispersed PPP funds would be used on payroll costs. On the Borrower Application Form for PPP No. 44226571-08, Defendant, on behalf of BNL certified that the information in the application was true and accurate, subject to criminal penalties for knowingly making false statements.

M. The representations made by Defendant in the PPP Application and Borrower Application Form required for disbursement of PPP No. 44226571-08 that it would use the proceeds for the PPP solely for payroll were materially false. The PPP was not needed to retain Defendant's Hanford staff augmentation workers, who made up the overwhelming majority of Defendant's workers, and was not needed for payroll because DOE had authorized its prime contractors to cover the payroll costs of their subcontractors, including BNL, for essential on-site work, telework or remote work, and being in a ready state where telework or remote work was not feasible. Accordingly, it would be impossible to use any of the PPP funds for the overwhelming majority of BNL's purported and represented payroll costs because those payroll costs were already being fully borne and reimbursed by federal DOE funds. Further, instead of using the PPP funds for permissible and authorized purposes, BNL used the PPP funds for impermissible expenses.

N. Subsequently, on or about December 2, 2020, Defendant, on behalf of BNL, requested forgiveness of the entire PPP No. 44226571-08 amount, $493,865, by certifying on the PPP Loan Forgiveness Application for PPP Loan No. 44226571-08 that the PPP

proceeds had been used for eligible uses and business expenses for BNL between April 18, 2020 and October 2, 2020, when they had not.

O.    In January 2021, Defendant, on behalf of BNL applied for a "second draw" PPP in the amount of $819,647.50, which FirstBank granted. While the majority of this PPP was used for appropriate and eligible business expenses, including for employees who were not assigned to DOE staff augmentation subcontracts, BNL also used a portion of these funds for non-qualifying business expenses, including paying off an EIDL obtained by BNL, which was not an eligible PPP expense. On August 5, 2021, Defendant, on behalf of BNL, nonetheless applied for, and was subsequently granted, forgiveness for the full PPP amount, including amounts used for non-qualifying business expenses.

P.    The United States contends that it has certain civil claims against Defendant under the False Claims Act, codified at 31 U.S.C. § 3729-3733, and the common law, as specified below, for knowingly submitting and causing to be submitted false and fraudulent applications PPP and EIDL on behalf of BNL between April 2020 and August 2021. This conduct, together with the conduct set forth in Recitals A through N above, is referred to herein as the Covered Conduct.

Q.    Defendant admits, acknowledges, and accepts responsibility for the facts set forth in Recitals A through O above, and agrees that those facts are true and accurate. However, the Parties agree that this Settlement Agreement is not an admission of liability by Defendant.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

1.      Defendant shall pay $1,105,498 (the Settlement Amount) to the United States, of which $493,865 is restitution. Of the Settlement Amount, the Parties agree that $493,865 in restitution to be paid by BNL pursuant to the Plea Agreement in 4:23-CR-06014-SAB (E.D. Wash.) shall be credited to the Settlement Amount, meaning the balance of the Settlement Amount, or $611,633, shall be paid by Defendant by electronic funds transfer pursuant to written instructions to be provided by the United States no later than 90 days after the Effective Date of this Agreement.

2.      Subject to the exceptions in Paragraph 3 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount, the United States releases Defendant, as well as BNL, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of fraud, breach of contract, payment by mistake, or unjust enrichment,

3.      Notwithstanding the releases given in Paragraph 2 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

   a.   Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

   b.   Any criminal liability;

   c.   Except as explicitly stated in the Agreement, any administrative liability or enforcement right, or any administrative remedy,

including the suspension and debarment rights of any federal agency;

d. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e. Any liability based upon obligations created by this Agreement;

f. Any liability of individuals other than Defendant and BNL;

4. Defendant waives and shall not assert any defenses he may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

5. Defendant fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Defendant or BNL has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

6. a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of Defendant, and its present or former officers, directors, employees, shareholders, and agents in connection with:

(1) the matters covered by this Agreement;

(2) the United States' audit and civil and criminal investigations of the matters covered by this Agreement;

(3) Defendant's investigation, defense, and corrective actions undertaken in response to the United States' audit and civil or criminal investigations in connection with the matters covered by this Agreement (including attorneys' fees);

(4) the negotiation and performance of this Agreement;

(5) the payments Defendant makes to the United States pursuant to this Agreement

are unallowable costs for government contracting purposes (hereinafter referred to as Unallowable Costs).

    b. Future Treatment of Unallowable Costs: Unallowable Costs will be separately determined and accounted for by Defendant, and Defendant shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

    c. Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of this Agreement, Defendant shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by Defendant or any of his subsidiaries or affiliates from the United States. Defendant agrees that the United States, at a minimum, shall be entitled to recoup from Defendant any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment. The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine Defendant's books and records and to

disagree with any calculations submitted by Defendant or any of their subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by Defendant, or the effect of any such Unallowable Costs on the amount of such payments.

7. This Agreement is intended to be for the benefit of the Parties only.

8. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

9. Each Party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

10. This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Eastern District of Washington. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

11. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

12. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

13. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

14. This Agreement is binding on Defendant's successors, transferees, heirs, and assigns.

15. All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

16. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

Vanessa R. Waldref
United States Attorney
Eastern District of Washington

DATED: 8/27/2024   BY: *[signature]*
Dan Fruchter
Assistant United States Attorney

DATED: 9/27/2024   BY: *[signature]* for
Tyler H.L. Tornabene
Assistant United States Attorney

DEFENDANT

DATED: 8/27/24    BY: _____
Wilson P. Stevenson, III

DATED: 8/27/24    BY: _____
Ed Yarbrough
Jonathan P. Farmer
Counsel for Defendant Wilson P. Stevenson, III