## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Attorney's Office for the Eastern District of Washington and on behalf of the Department of Energy and the Small Business Administration (collectively the "United States"), HMP Corporation ("HPMC"), Hollie P. Mooers ("Ms. Mooers"), and Grover Cleveland Mooers ("Mr. Mooers"), all through their authorized representatives and collectively referred to herein as the "Parties." HPMC, Ms. Mooers, and Mr. Mooers will be collectively referred to herein as "Defendants."

## RECITALS

A.    Defendant HPMC is a Washington corporation with its principal place of business in Kennewick, Washington, that specializes in occupational medicine.

B.    Ms. Mooers is the registered agent for HPMC, and both Ms. Mooers and Mr. Mooers serve as governors for HPMC. Additionally, Ms. Mooers serves as President and Chief Executive Officer of HPMC.

C.    The United States Department of Energy ("DOE") oversees environmental remediation efforts at the Hanford Site in southeastern Washington State. In 2012, HPMC was awarded the Hanford Occupational Medicine Services prime contract to provide occupational medical and health services to workers at the Hanford Site, located in Southeastern Washington state. Most recently, in 2018, HPMC was competitively re-awarded the Hanford Occupational Medicine Services contract, under Department Contract No. 89303919DEM000005.

D.    The United States Small Business Administration ("SBA") is a federal agency dedicated to small businesses that provides counseling, capital, and contracting expertise. Under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), enacted on March 27, The SBA received authority to temporarily guarantee loans under a new 7(a) loan program titled, "Paycheck Protection Program" (PPP). This SBA-backed loan program was designed to help businesses keep their workforce employed during the COVID-19 crisis. The PPP loans were not directly distributed through the SBA. Rather, the SBA approved 7(a) lenders to make PPP loans on a delegated basis. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. The SBA maintained the power to exercise authority over PPP loan administration.

E.    Under the PPP loan program, the entire loan amount may be forgiven if used to cover business costs that are eligible for forgiveness. However, for 100% forgiveness, at least 60% of loan must be used on payroll costs, and the remaining 40% may be spent on interest on mortgages, rent, and utilities in the 24 weeks post loan disbursement.

F.    The United States contends that it has certain civil claims against Defendants arising from the Covered Conduct, as defined below in Paragraph 3. Defendants admit that the facts set forth in Attachment A and in HPMC's Deferred

Prosecution Agreement and related Criminal Complaint, United States v. HPMC, ---- (E.D.Wash.), hereto are true and correct.

G.     As part of a separate Deferred Prosecution Agreement (DPA) between the United States, acting through the United States Attorney's Office for the Eastern District of Washington (the "USAO") and HPMC, and related Criminal Complaint, United States v. HPMC, ---- (E.D.WA), HPMC has consented to the filing of a one-count criminal Complaint in the United States District Court for the Eastern District of Washington, charging HPMC with one count of submitting false and fraudulent claims in violation of Title 18, United States Code, Section 287, relating to the submission of the April 2021 forgiveness application for HPMC's PPP loan.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## **TERMS AND CONDITIONS**

1.     Defendants shall pay to the United States $2,939,400.00 ("Settlement Amount"), of which $1,344,700.00 is restitution (the "Restitution Amount"). The Settlement Amount shall be paid as follows: (a) $1,344,700.00 paid by HPMC as restitution; (b) $1,344,700.00 paid by HPMC as a penalty to the United States; and (c) $250,000.00 paid by Ms. and Mr. Mooers as a penalty to the United States. Ms. and Mr. Mooers represent and agrees that they have not and will not seek

indemnification for the $250,000.00 from any third party, including HPMC, or through any agreement or insurance policy under which they may be entitled to pursue a claim.

2.    All amounts shall be paid by electronic funds transfer no later than 90 calendar days after the Effective Date of this Agreement. The $1,344,700.00 paid by HPMC as restitution shall be credited to the HPMC deferred prosecution agreement, *United States v. HPMC*, ---- (E.D.WA). Payments made by electronic funds transfer shall be made pursuant to written instructions to be provided by the United States Attorney's Office for the Eastern District of Washington.

3.    "Covered Conduct" means, for the time period between March 1, 2020, and March 1, 2022, the admitted conduct set forth in the Statement of Facts attached hereto as Exhibit A.

4.    Defendants represent that effective April 1, Mr. Mooers will step down as Governor of HPMC and shall not serve in any managerial or advisory role for HPMC, or a principal employee as such term is defined by 48 C.F.R. § 52.209-5(a)(2) for at least three years from the date of this agreement.

5.    Subject to the exceptions in Paragraph 6 (concerning excluded claims) below, and conditioned upon Defendants' full payment of the Settlement Amount, the United States releases Defendants, together with any divisions, subsidiaries, parent companies, affiliates, and corporate successors and assigns from any civil or administrative monetary claim the United States has for the Covered Conduct under

the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Contract Disputes Act, 41 U.S.C. §§ 7101-7109; or the common law theories of unjust enrichment and fraud;

6.    Notwithstanding the releases given in Paragraph 5 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

a.    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.    Any criminal liability;

c.    Except as explicitly stated in this Agreement, any administrative liability, including the suspension and debarment rights of any federal agency;

d.    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.    Any liability based upon obligations created by this Agreement;

f.    Any liability of individuals other than Defendants Ms. Mooers and Mr. Mooers;

g.    Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

7.    Defendants waive and shall not assert any defenses Defendants may have to any criminal prosecution or administrative action relating to the Covered

Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

8.      Defendants fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Defendants have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

9.      Defendants agree to the following:

a.      Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of Defendants, and their present or former officers, directors, employees, shareholders, and agents, in connection with:

(1)     the matters covered by this Agreement;

(2)     the United States' audit(s) and civil and criminal investigation(s) of the matters covered by this Agreement;

(3)     Defendants' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and criminal investigation(s) in connection with the

matters covered by this Agreement (including attorney's fees);

(4)    the negotiation and performance of this Agreement;

(5)    the payment Defendants make to the United States pursuant to this Agreement;

are unallowable costs for government contracting purposes (hereinafter referred to as "Unallowable Costs").

b.    Future Treatment of Unallowable Costs:  Unallowable Costs will be separately determined and accounted for by Defendants, and Defendants shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

c.    Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of this Agreement, Defendants shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by Defendants or any of their subsidiaries or affiliates from the United States.  Defendants agree that the United States, at a minimum, shall be entitled to recoup from Defendants any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment.  The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine Defendants' books and records and to

disagree with any calculations submitted by Defendants or any of their subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by Defendants, or the effect of any such Unallowable Costs on the amount of such payments.

10.     This Agreement is intended to be for the benefit of the Parties and the individuals and entities released in this Agreement only.

11.     Defendants agree to cooperate fully and truthfully with the United States' investigation, relating to the Covered Conduct, of individuals and entities not released in this Agreement. Upon reasonable notice, Defendants shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. Defendants further agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

12.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

13.    Each party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

14.    This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Eastern District of Washington. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute. If any provisions of this Agreement are held to be illegal, invalid, or unenforceable by a court or agency of competent jurisdiction under present or future laws that apply to this Agreement, those provisions will be fully severable.  In place of any severed provision, the Parties agree to substitute a legal, valid, and enforceable provision which is as similar as possible to the severed provision.

15.    This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

16.    The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

17.    This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

18.    This Agreement is binding on the Parties and their successors, transferees, heirs, and assigns.

19.    All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

20.    This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: 3/21/22

Daniel H. Fruchter
Assistant United States Attorney

DATED: 3-21-22

Tyler H.L. Tornabene
Assistant United States Attorney

DATED: 3/21/22

Frieda Kay Zimmerman
Special Assistant United States Attorney
Counsel for the United States of America

HPMC

DATED: March 15, 2022    *Hollie Mooers*
Hollie P. Mooers, President and CEO
HPMC

DATED: 3/15/2022    David Panzer
Whiteford Taylor Preston LLP
Counsel for HPMC

HOLLIE P. MOOERS

DATED: March 15, 2022    Hollie Mooers
Hollie P. Mooers

DATED: March 15, 2022    Danny Onorato
Schertler Onorato Mead & Sears
Counsel for Hollie P. Mooers

11

GROVER CLEVELAND MOOERS


DATED: March 15, 2022 Grover C. Mooers
                      Grover Cleveland Mooers


DATED: March 15, 2022
                      Danny Onorato
                      Schertler Onorato Mead & Sears
                      Counsel for Hollie P. Mooers

12

Attachment A – Statement of Facts

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the settlement agreement (the "Agreement") between the United States of America, acting through the United States Attorney's Office for the Eastern District of Washington and on behalf of the Department of Energy and the Small Business Administration (collectively the "United States"); HPM Corporation ("HPMC"); Hollie P. Mooers ("Ms. Mooers") and Grover Cleveland Mooers ("Mr. Mooers") (HPMC, Ms. Mooers, and Mr. Mooers collectively referred to hereinafter as "Defendants"). The United States and Defendants agree that the following facts are true and correct. Nothing in this Statement of Facts, however, is or will be construed to be an admission of criminal liability by the Defendants, except to the extent provided by the separate Deferred Prosecution Agreement (DPA) between the United States Attorney's Office for the Eastern District of Washington (the "USAO") and HPMC, *United States v. HPMC*, ---- (E.D.WA). The relevant time period for the Statement of Facts is March 1, 2020, to March 1, 2022.

## RELEVANT ENTITIES

1. Defendant HPMC is a Washington corporation with its principal place of business in Kennewick, Washington, specializing in occupational medicine.

2. Hollie P. Mooers ("Ms. Mooers") is the registered agent for HPMC, and both Ms. Mooers and Grover Cleveland Mooers ("Mr. Mooers") serve as HPMC's

**Attachment A – Statement of Facts**

governors. Additionally, Ms. Mooers serves as President and Chief Executive Officer (CEO) of HPMC.

3. The United States Department of Energy ("DOE") oversees environmental remediation efforts at the Hanford Site in southeastern Washington State. In 2012, HPMC was awarded the Hanford Occupational Medicine Services prime contract to provide occupational medical and health services to workers at the Hanford Site, located in Southeastern Washington state. Most recently, in 2018, HPMC was competitively re-awarded the Hanford Occupational Medicine Services contract, under Department Contract No. 89303919DEM000005.

4. The United States Small Business Administration ("SBA") is a federal agency dedicated to small businesses that provides counseling, capital, and contracting expertise. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, the SBA received authority to temporarily guarantee loans under a new 7(a) loan program.

## PAYCHECK PROTECTION PROGRAM BACKGROUND

5. The Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act) was enacted on March 27, 2020, to provide over $2 trillion of economic relief to workers, families, small businesses, industry sectors, and other levels of government that have been hit hard by the public health crisis created by the Coronavirus (COVID-19). Among the provisions contained in the CARES Act are provisions authorizing the

**Attachment A – Statement of Facts**

Small Business Administration (SBA) to temporarily guarantee loans under a new 7(a) loan program titled Paycheck Protection Program ("PPP").

6. This SBA-backed loan program was designed to help businesses keep their workforce employed during the COVID-19 crisis. Under the PPP, borrowers received loans to cover payroll costs and certain eligible nonpayroll costs. A borrower could apply for forgiveness once all loan proceeds for which the borrower was requesting forgiveness have been used. Borrowers could apply for forgiveness at any time up to the maturity date of the loan. If borrowers did not apply for forgiveness within 10 months after the last day of the covered period, then PPP loan payments were no longer deferred, and borrowers would begin making loan payments to their PPP lender. Loans guaranteed under the PPP were 100 percent guaranteed by SBA, and the full principal amount of the loans could in some circumstances qualify for loan forgiveness.

7. A company was eligible for a PPP loan if it has 500 or fewer employees whose principal place of residence is in the United States or was a business that operates in a certain industry and met the applicable SBA employee-based size standards for that industry, and was in operation on February 15, 2020.

8. In order to obtain a PPP loan, each applicant was required to provide information about the subject business's operations, such as the date of opening, number of employees, and past revenues. Each applicant was also required to certify

**Attachment A – Statement of Facts**

that all the information in the application was true and correct to the best of the applicant's knowledge.

9. Under the PPP loan program, the maximum loan amount is the lesser of $10 million or an amount calculated using a payroll-based formula specified in the Act. The entire loan amount may be forgiven. However, for 100% forgiveness, at least 60% of loan must be used on payroll costs, and the remaining 40% may be spent on interest on mortgages, rent, and utilities in the 24 weeks post loan disbursement.

10. The PPP loans were not directly distributed through the SBA. Rather, the SBA approved 7(a) lenders to make PPP loans on a delegated basis. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. The SBA maintained the power to exercise authority over PPP loan administration.

**The Investigation**

11. In August 2021, the DOE OIG received a complaint from a Department Official alleging that HPMC had applied for and received a PPP loan in the amount of $1,344,700, and subsequently had the total loan amount fraudulently forgiven. An investigation was initiated and revealed the following.

12. On April 3, 2020, HPMC, through Grover Cleveland Mooers, applied for a PPP loan through Community First Bank. This application was submitted through the SBA "E-Tran server," located in Sterling, VA.

## Attachment A – Statement of Facts

13. On the Borrower Application Form, Mr. Mooers certified, on behalf HPMC, that the, "*current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant*" and that "*the funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.*"

14. This loan was approved and the SBA assigned PPP loan number "7352397001." Community First Bank handled this loan on a delegated basis from the SBA. Community First Bank submitted disbursement details for this loan into the SBA E-Tran system located in Sterling, VA.

15. On April 17, 2020, a PPP loan of $1,344,700 was deposited into HPMC's Business Bank Account. After deposit of the PPP loan was made, the same day an inter-bank transfer of $1,344,700 was made from HPMC's Business Bank Account to HPMC's Business Premium Money Market Account. The sum of $1,344,700 remained in the money market account until July 1, 2021.

16. The coverage period of the loan, during which HPMC was required to use the funds for authorized purposes in order to receive forgiveness, was from April 17,

## Attachment A – Statement of Facts

2020, through September 30, 2020. However, HPMC did not use the PPP loan proceeds to maintain payroll or for other covered business expenses during the loan coverage period, or at any point after.

17. On April 6, 2021, Mr. Mooers, on behalf of Ms. Mooers and HPMC, submitted a PPP Loan Forgiveness Application, Form 3508EZ, to the SBA through a SBA cloud-based platform (Summit) through the AWS GOVcloud server located in Oregon, as well as to Community First Bank.

18. On the loan forgiveness application, HPMC certified, through Mr. Mooers, that "*the dollar amount for which forgiveness is requested… was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures).*"

19. HPMC further certified, through Mr. Mooers, that "*[t]he Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.*"

20. HPMC also certified, through Mr. Mooers, that "*[t]he information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects. I understand that knowingly*

**Attachment A – Statement of Facts**

*making a false statement to obtain forgiveness of an SBA guaranteed loan is punishable under the law....*"

21. HPMC also certified, through Mr. Mooers, that "*I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.*"

22. On April 13, 2021, based in part on the certification that the dollar amount for which forgiveness was being requested was used to pay business costs eligible for forgiveness such as payroll, SBA forgave HPMC's PPP loan of $1,358,184.35 principal of the loan ($1,344,700), plus the interest ($13,484.35) in full.

23. The SBA issued a "Notice of Paycheck Protection Program Forgiveness Payment," and on April 14, 2021, the forgiven amount of $1,358,184.35 was transmitted by the SBA from the Denver Finance Center in Denver, CO, and routed through the Financial Management Service system located in Sterling, VA, before proceeding to Community First Bank in Kennewick, WA.  The SBA also paid a lender fee to Community First Bank of $40,341.00.

24. On April 14, 2021, the SBA Denver Finance Center located in Denver, Colorado created and certified the payment file and transmitted the file to the U.S. Treasury data processing site in Kansas City, Missouri (KROC). KROC sent the file to the National Payment Center of Excellence (NPCE), also located in Kansas City, Missouri. The NPCE then sent the payment authorization to the Federal Reserve

**Attachment A – Statement of Facts**

Bank (FRB) in East Rutherford, New Jersey. Finally, the FRB submitted an ACH payment to Community First Bank in Kennewick, Washington.

25. From the date of the loan application on April 3, 2020, to the date of the forgiveness application on April 6, 2021, the Department maintained payments to HPMC under the Contract No. 89303919DEM000005.

26. HPMC, through Mr. Mooers, certified to the SBA that the PPP Loan funds were used for authorized purposes and were thus eligible for forgiveness. This certification was knowingly false. This false certification was material.

27. On July 1, 2021, the sum of $1,344,700 was transferred from HPMC's Business Premium Money Market Account to Mr. and Ms. Mooers' personal Community Bank Checking Account.

28. A subsequent OIG audit identified that HPMC had obtained a PPP loan and OIG Audits contacted HPMC officials regarding the PPP loan.  In a response questioning from OIG Audit, an HPMC official confirmed on August 2, 2021, that "*the loan was never used to cover any business operations to include payroll or other facility expenses*."

29. On September 14, 2021, HPMC officials represented that a third-party consultant, "Cornerstone Wealth Strategies," was used to distribute the PPP loan funds to various charities and that "*the charities were not handled through HPMC and were done as personal donations outside of HPMC. The full amount of the loan*

**Attachment A – Statement of Facts**

*was sent to Cornerstone Wealth Strategies to disburse to the charities directly. As previously stated, at no time did HPMC use any of those funds to cover CARES Act 3610 related expenses*."

30. On November 4, 2021, HPMC Employee Number 1 for HPMC further confirmed to DOE OIG that HPMC applied for the PPP loan, the Department continued to pay for contract services HPMC performed through the coronavirus pandemic, the PPP loan proceeds were not used for payroll related expenses, the PPP loan sat in the bank account and was not used until July 2021 when the loan proceeds were transferred out of the HPMC bank account, and the PPP loan proceeds were donated to charity through personal contributions by the Mr. and Ms. Mooers and not HPMC.

31. On November 4, 2021, HPMC Employee Number 2 for HPMC also confirmed to DOE OIG that the PPP loan was not used for payroll related expenses, the Department continued to pay HPMC for contract services performed, and the PPP loan proceeds were donated to charity.

32. HPMC continued to receive full payment under their preexisting prime contract with the Department during the time in question. In fact, because HPMC is the on-site Occupational Health provider for the Department's Hanford Site, HPMC's business with the Department grew due to the coronavirus pandemic as

**Attachment A – Statement of Facts**

they were awarded additional contract task orders related to coronavirus testing and vaccine administration.

33. HPMC, through Mr. Mooers, knowingly provided materially false statements to the SBA in support of HPMC's application for loan forgiveness. HPMC, through Mr. Mooers, falsely certified that the loan's proceeds were utilized for covered HPMC business-related expenses and that the loan was eligible for forgiveness when it was not.

34. These materially false representations made to the SBA caused the SBA to forgive the $1,358,184.35, principal of the loan ($1,344,700) plus the interest of 1% ($13,484.35) PPP loan in its entirety. Furthermore, upon forgiveness of the PPP loan, Mr. Mooers and Ms. Mooers transferred the sum value of the $1,344,700 PPP loan into their personal checking account where they utilized the government funds for non-covered PPP loan related expenses.