Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Dan Fruchter
Tyler H.L. Tornabene
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

**Oct 22, 2024**

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:23-CR-6014-SAB |
| Plaintiff, | |
| vs. | PLEA AGREEMENT |
| BNL TECHNICAL SERVICES LLC, | |
| Defendants. | |

Plaintiff, United States of America, by and through Vanessa R. Waldref, United States Attorney for the Eastern District of Washington and Dan Fruchter and Tyler H.L. Tornabene, Assistant United States Attorneys, and Defendant BNL TECHNICAL SERVICES LLC (hereinafter "Defendant") and Defendant's counsel, Edward Yarbrough, Jonathan P. Farmer, and Scott Johnson agree to the following Plea Agreement:

1.    <u>Guilty Pleas and Maximum Statutory Penalties:</u>

Defendant, BNL TECHNICAL SERVICES, LLC , agrees to plead guilty to Count 8 of the Indictment returned by the Grand Jury on April 18, 2023, charging Defendant with Bank Fraud in violation of 18 U.S.C. § 1344(1), (2), a Class B felony. Defendant understands that the following potential penalties apply:

(a)    not more than a 5-year term of probation;

(b)   a fine not to exceed $1,000,000;

(c)   restitution; and

(d)   a $400 special penalty assessment.

2.   <u>The Court is Not a Party to the Agreement:</u>

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands the following:

a.   sentencing is a matter solely within the discretion of the Court;

b.   the Court is under no obligation to accept any recommendations made by the United States or Defendant;

c.   the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

d.   the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

e.   the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

f.   the Court may reject recommendations made by the United States or Defendant, and that will not be a basis for Defendant to withdraw from this Plea Agreement or Defendant's guilty plea.

3.   <u>Defendant BNL TECHNICAL SERVICES, LLC Organization:</u>

Defendant understands that this Plea Agreement is intended to bind Defendant and that if Defendant changes names, reorganizes, merges, or otherwise ceases operations in its current form, the person or entity acquiring the assets or taking over the operation of Defendant's company shall take over the obligations of this Plea Agreement.  The Defendant further agrees to provide the United States Attorney's Office for the Eastern District of Washington and the United States Probation Office

for the Eastern District of Washington with immediate notice of any name change, business reorganization, sale or purchase of assets, divestiture of assets, or similar action impacting the operation of its business.

No name change, change in corporate or individual control, business reorganization, change in ownership, merger, change of legal status, sale or purchase of assets, or similar action shall alter the Defendant's responsibilities under this Plea Agreement. Defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this Plea Agreement. This Plea Agreement, together with all of the obligations and terms thereof, shall inure to the benefit and shall bind assignees, subsidiaries, successors-in-interest, or transferees of Defendant.

4.    Waiver of Constitutional Rights:

Defendant understands that by entering a plea of guilty, Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

    (a)    The right to a jury trial;

    (b)    The right to see, hear, and question the witnesses;

    (c)    The right to remain silent at trial;

    (d)    The right to testify at trial; and

    (e)    The right to compel witnesses to testify.

Defendant understands and agrees that any defense motions currently pending before the Court are mooted by this Plea Agreement, and Defendant expressly waives Defendant's right to bring any additional pretrial motions.

5.    Elements of the Offense:

The parties agree that, in order to convict Defendant of Bank Fraud, in violation of 18 U.S.C. § 1344(1), as charged in Count 8, the United States would have to prove beyond a reasonable doubt the following elements:

    -    First, between on or about April 13, 2020, and on or about August 5, 2021, in the Eastern District of Washington and elsewhere, Defendant BNL TECHICAL SERVICES, LLC, knowingly

executed a scheme to defraud FirstBank, a financial institution, of something of value;

- Second, that the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

- Third, Defendant did so with the intent to defraud FirstBank; and

- Fourth, FirstBank was insured by the Federal Deposit Insurance Commission.

The parties agree that, in order to convict Defendant of Bank Fraud, in violation of 18 U.S.C. § 1344(2), as charged in Count 8, the United States would have to prove beyond a reasonable doubt the following elements:

First, between on or about April 13, 2020 and on or about August 5, 2021, in the Eastern District of Washington and elsewhere, Defendant BNL TECHNICAL SERVICES, LLC knowingly carried out a scheme or plan to obtain money or property from FirstBank, a financial institution, by making false or fraudulent statements;

Second, Defendant knew that the statements or promises were false or fraudulent;

Third, the statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, a financial institution to part with money or property;

Fourth, Defendant acted with the intent to defraud; and

Fifth, FirstBank was federally chartered or insured.

6.    Factual Basis and Statement of Facts:

The parties stipulate and agree that the United States could prove the following facts beyond a reasonable doubt at trial, and these facts constitute an adequate factual basis for Defendant's guilty pleas.  This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are

relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

Beginning on a date unknown but no later than April 13, 2020 and continuing to a date unknown but at least until August 5, 2021, in the Eastern District of Washington and elsewhere, Defendant BNL TECHNICAL SERVICES LLC (BNL) devised and intended to devise a scheme and artifice to defraud the United States Small Business Administration (SBA) and FirstBank, a federally-insured financial institution and SBA-delegated lender, and to obtain money and property from SBA and FirstBank by means of materially false and fraudulent pretenses, representations, and promises, using signals and sounds transmitted by wire communication in interstate commerce to execute and attempt to execute the scheme and artifice to defraud.

As part of the scheme, Defendant sought and obtained Paycheck Protection Program (PPP) funding without any intent to use the funding thereof for authorized purposes, and to fraudulently obtain forgiveness of the PPPs. Defendant was a subcontractor primarily providing staff augmentation (*i.e.* labor) services for prime contractors at the United States Department of Energy's (DOE) Hanford Nuclear Site (Hanford) in southeastern Washington. As such, Defendant's DOE staff augmentation payroll continued to be fully reimbursed with federal tax dollars directly by DOE through its prime contractors. In addition, Defendant provided staff augmentation to the United States Veterans Administration (VA) at relevant times its VA staff augmentation payroll continued to be fully reimbursed with federal tax dollars directly by the VA. Accordingly, at no point did Defendant BNL have any need for PPP funds for its DOE prime contractor staff augmentation payroll or its VA staff augmentation payroll. Nonetheless, it was part of the scheme that Defendant fraudulently applied for and obtained PPP proceeds for payroll costs and for the same employees that Defendant knew were already covered by other federal tax dollars through DOE prime contractor payments and the VA.

It was further part of the scheme that Defendant submitted two PPP Loan Forgiveness Applications requesting the forgiveness of two PPPs by falsely and fraudulently representing and certifying to the SBA that his company, Defendant BNL, had used the PPP funding as authorized and intended for payroll and other authorized business expenses, when in fact significant portions of the PPP funding was not used for payroll or other authorized business expenses, but rather transferred for the benefit of BNL and its owner.

*BNL Technical Services LLC at the Hanford Site*

At relevant times, Wilson Pershing Stevenson III was the sole owner, operator, and manager of Defendant, a business incorporated in the State of Washington and with its principal place of business in Richland, Washington. Defendant primarily provided staff augmentation services to DOE prime contractors at the Hanford Site. Defendant also provided staff augmentation services to the VA in the Eastern District of Washington.   At all relevant times, FirstBank was a Federal Deposit Insurance Commission-insured financial institution, and a participating Paycheck Protection Program SBA delegated lender, headquartered in Nashville, Tennessee.

At relevant times, Defendant had staff augmentation subcontracts with multiple DOE prime contractors.  Under the Defendant staff augmentation subcontracts with the DOE prime contractors, the hours for each Defendant worker for which a DOE prime contractor owed would be directly, and at regular intervals, invoiced pursuant to those contracts and Defendant would be fully reimbursed for those workers' hours at the agreed-upon rate, which included not only the workers' actual compensation and benefits, but also overhead costs including Defendant's general and administrative expenses.  These additional overhead costs in the Defendant's staff augmentation subcontract rates indirectly covered the payroll costs for additional employees of Defendant.  At all relevant times during the existence of Defendant's staff augmentation subcontracts, the invoicing for the reimbursable hours of Defendant's payroll and other costs continued.  Further, Defendant was always paid by DOE

through its prime contractors for the reimbursable hours of its staff augmentation workers, whether or not those employees were able to work, including during times that the employees were not able to work due to COVID-19 related shutdowns. The process of DOE, through its prime contractors, paying for Defendant's staff augmentation payroll based on invoices for reimbursable hours, on a per-worker basis, did not change regardless of whether or not the funds were for hours worked in person at Hanford, for hours worked remotely by, for instance, authorized telework, or for Defendant workers who were unable to work but were being maintained in a ready-state as authorized during the COVID-19 pandemic. All such payments to Defendant were made using public DOE funds that DOE prime contractors themselves drew down from their respective DOE lines of credit.

*The CARES Act*

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) was a federal law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and other certain expenses, through a program referred to as the PPP. Another source of relief provided by the CARES Act was COVID-19 relief funding through the Economic Injury Disaster Loan (EIDL) program. EIDL is an SBA program that provides low-interest funding to small businesses, renters, and homeowners affected by declared disasters. Anther source of relief provided by the CARES Act was provided in Section 3610 of the CARES Act, sometimes referred to at Hanford, and herein, as "COVID Safety Pay." Section 3610 of the CARES Act generally authorized government agencies to reimburse contractors for paid leave provided to contractor personnel and subcontractors during the COVID-19 national emergency in order to keep the federal government contracting workforce in a ready state during the pandemic.

In order to obtain a PPP, a qualifying business was required to submit a PPP application signed by an authorized representative of the business. The PPP application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP. In the PPP application, the applicant (through its authorized representative) was required to state, among other things: (a) its average monthly payroll expenses; and (b) its number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. Additionally, the applicant was required to certify that they were in operation as of February 15, 2020.  The applicant was also required to certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant," and that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payment, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold be legally liable, such as for charges of fraud."  The applicant was also required to certify that the information in the application was true and correct to the best of the applicant's knowledge.

A business's PPP application was received and processed, in the first instance, by a participating lender. If a PPP application was approved, the participating lender funded the PPP using its own monies. Data from the application, including information about the borrower, the total amount of the loan, the listed number of employees, and the gross income amount, was transmitted by the lender to the SBA, an agency of the United States, in the course of processing the loan.

PPP applications are received in cloud-based platforms. The location of the server through which the PPP application is submitted is based on the date the application was processed by the SBA and the application number. During the time period relevant to this Indictment, all PPP applications were received through the

Summit platform, a cloud-based platform utilizing the AWS GOV cloud servers located in Oregon.  PPP lenders submitted disbursement details into the SBA E-Tran system in Sterling, Virginia.   E-Tran transmitted the PPP processing fee to the lender through the United States Treasury's Financial Management System (FMS) to the Treasury. The primary server for FMS is in Sterling, Virginia.

A PPP borrower can repay the loan or can chose to seek forgiveness of the loan from the SBA by making certain representations and certifications.  In order to obtain SBA forgiveness of a PPP loan a borrower is required to submit an SBA form 3508 also known as a PPP Loan Forgiveness Application.  In the PPP Loan Forgiveness Application, the borrower choses between 8 and 24 weeks from the date of the PPP loan as the covered period for the loan.  In the PPP Loan Forgiveness Application, the borrower is required to certify the amount of the PPP Loan proceeds which the borrower used for payroll and other authorized business expenses during the covered period.  In order to obtain forgiveness of the entire PPP Loan amount a borrower must have spent at least 60% of the PPP Loan proceeds on payroll costs during the covered period and up to 40% on other authorized business expenses such as mortgage interest payments of the business, lease payments of the business, or utility payments of the business.  PPP proceeds used to pay business debts incurred prior to the covered period, which begins on the loan approval date, are not authorized business expenses and therefore are not eligible for SBA forgiveness.  Similarly, PPP proceeds used to pay interest accrued on business debts due prior to the covered period are not authorized business expenses and therefore are not eligible for SBA forgiveness.

Further, in order for a borrower to obtain SBA forgiveness of a PPP loan the borrower must certify, among other things, the dollar amount for which forgiveness is requested, that the PPP Loan proceeds were used to pay eligible costs during the covered period, that the payroll costs were equal to at least 60% of the forgiveness amount, and that the borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the borrower is requesting forgiveness.

In order to obtain an EIDL and advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was the year preceding January 31, 2020. The applicant must also certify that all the information in the application is true and correct to the best of the applicant's knowledge. The amount of an EIDL, if the application is approved, is determined based, in part, on the information provided in the application about employment, revenue, and cost of goods, as set forth above. Any funds issued under an EIDL or advance are issued directly by the SBA. EIDL funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

EIDL applications are received in cloud-based platforms. The location of the server through which the EIDL application is submitted is based on the date the application was processed by SBA and the application number. During the time period relevant to this Indictment, all EIDL applications were either received through the DCMS 2.0 servers located in Quincy, Washington, or in a Microsoft cloud-based platform using a Rapid Finance application, through SBA servers located in Des Moines, Iowa.

Unlike a PPP Loan, which can be forgiven by the SBA, an EIDL is required to be paid back to the SBA. Consequently, a borrower cannot seek forgiveness of PPP Loan proceeds where the borrower has used those proceeds to pay off any portion of a borrower's EIDL.

At Hanford, DOE applied Section 3610 of the CARES Act, known as COVID Safety Pay, to contractor and subcontractor employees who could not perform work on a government-owned, government-leased, contractor-owned, or contractor-leased facility or site approved by the federal government for contract performance due to closures or other restrictions, and were unable to telework because their job duties

cannot be performed remotely during the pandemic.  Defendant BNL applied for and received COVID Safety Pay from DOE prime contractors to use for qualifying BNL staff augmentation payroll.

<u>Defendant's Scheme to Defraud and its Manner and Means</u>

Beginning no later than on or about April 13, 2020, and continuing through at least August 5, 2021, in the Eastern District of Washington and elsewhere, Defendant devised and intended to devise a scheme to defraud the SBA and financial institutions including FirstBank, a federally insured financial institution and SBA- delegated lender, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, using signals and sounds transmitted by wire communication in interstate commerce to execute and attempt to execute the scheme and artifice to defraud.

Specifically, as part of the scheme, Defendant fraudulently obtained from FirstBank $493,865 in PPP funds intended for payroll and other eligible business costs, knowingly misused those funds for ineligible, non-business costs, and then falsely and fraudulently sought and obtained forgiveness for the entire PPP amounts, including the portions wrongfully obtained and misused for ineligible expenses. Because Defendant was already being fully reimbursed for payroll costs through its DOE and VA staff augmentation contracts and subcontracts, including for Defendant's employees who were not working due to the COVID-19 pandemic for which Defendant was seeking and receiving COVID Safety Pay, Defendant did not meet the economic necessity requirements for a PPP for the already covered payroll, and Defendant's application led to Defendant receiving duplicative federal payments to cover payroll for the same employees during the same time periods.

On or about April 13, 2020, despite knowing that it was in fact receiving its staff augmentation payroll funds from DOE, through its DOE prime contractors, as well as from the VA, Defendant submitted an application for PPP No. 44226571-08 for "payroll costs" in the amount of $493,865 to FirstBank, a delegated SBA lender,

and to the SBA.  Defendant improperly calculated those payroll costs based on the payroll costs for Defendant staff augmentation employees whose payroll, as Defendant knew, was already being fully reimbursed by DOE, through its prime contractors as well as by the VA.  On or about April 13, 2020, as a result of and in reliance on the false and fraudulent representations and promises Defendant made in the PPP Application No. 44226571-08, First Bank approved the PPP in the amount of $493,865.

On or about April 18, 2020, Defendant electronically submitted a Borrower Application Form for PPP No. 44226571-08 to First Bank as the participating SBA lender and to the SBA.  Defendant falsely and fraudulently promised and represented that the PPP funds would be used to retain workers and maintain payroll. Defendant further falsely and fraudulently promised and represented that Defendant had accurately calculated payroll costs (including amounts required to be excluded from payroll costs), average monthly payroll, and the loan amount requested.  A properly signed Borrower Application Form is required to make a determination regarding an applicant's eligibility for financial assistance. Defendant further falsely and fraudulently represented and certified on its loan application that dispersed PPP funds would be used on payroll costs.  On the Borrower Application Form for PPP No. 44226571-08, Defendant certified that the information in the application was true and accurate, subject to criminal penalties for knowingly making false statements.

The representation made by Defendant in the PPP Application and Borrower Application Form required for disbursement of PPP No. 44226571-08 that it would use the proceeds for the PPP solely for payroll was materially false, and Defendant knew it was false at the time the representation was made because Defendant knew at that time that the PPP was not needed to retain Defendant's Hanford staff augmentation workers, who made up the overwhelming majority of Defendant's workers, and was not needed for, payroll because DOE had authorized its prime contractors to cover the payroll costs of their subcontractors, including Defendant, for

Plea Agreement- 12 of 21

essential on-site work, telework or remote work, and being in a ready state where telework or remote work was not feasible. Accordingly, as Defendant knew, it would be impossible to use any of the PPP funds for the overwhelming majority of Defendant's purported and represented payroll costs because those payroll costs were already being fully borne and reimbursed by federal DOE funds. Further, instead of using the PPP funds for permissible and authorized purposes, Defendant used the PPP funds for impermissible expenses.

On or about April 20, 2020, as a result of and in reliance on the materially false and fraudulent representations that Defendant made in the PPP Application No. 44226571-08 and the Borrower Application Form for PPP No. 44226571-08, the SBA participating lender, First Bank, disbursed $493,865.00 in PPP funding which was deposited into the BNL Operating Account. Had the SBA or FirstBank known the true facts, and had known that these representations and certifications, or any one of them, by Defendant on either the PPP Application for PPP No. 44226571-08 or the Borrower Application Form for PPP No. 44226571-08 were false and fraudulent, neither the SBA nor FirstBank would have approved PPP No. 44226571-08 or allowed for the disbursement of the resulting PPP proceeds of $493,865.00. In the next eight days after the fraudulently-obtained PPP proceeds were disbursed to the BNL Operating Account, Defendant transferred and used more than $424,230 of the PPP proceeds on unauthorized expenditures.

Subsequently, on or about December 2, 2020, Defendant falsely and fraudulently requested forgiveness of the entire PPP No. 44226571-08 amount, $493,865, by falsely and fraudulently certifying on the PPP Loan Forgiveness Application for PPP Loan No. 44226571-08 that the PPP proceeds had been used for eligible uses and business expenses for BNL between April 18, 2020 and October 2, 2020.

In January 2021, Defendant applied for a "second draw" PPP in the amount of $819,647.50, which FirstBank granted. While the majority of this PPP was used for

appropriate and eligible business expenses, including for employees who were not assigned to DOE staff augmentation subcontracts, Defendant also used a portion of these funds for non-qualifying business expenses, including paying off an EIDL obtained by Defendant, which was not an eligible PPP expense.  On August 5, 2021, Defendant nonetheless applied for, and was subsequently granted, forgiveness for the full PPP amount, including amounts used for non-qualifying business expenses.

Defendant admits that between April 13, 2020 and August 5, 2021, in the Eastern District of Washington and elsewhere, it engaged in a scheme and artifice to defraud FirstBank, a federally-insured financial institution, through the use of material false statements, representations, and promises, of $493,865, and to obtain $493,865 in the custody, possession, and control of FirstBank through the scheme and Defendant's use of materially false and fraudulent statements and promises.

7.     The United States Agrees:

(a)     To Dismiss Counts:

At the time of sentencing, the United States agrees to move to dismiss Counts 1 through 7 and 9 through 11 of the Indictment as to Defendant.  The United States further agrees, at the time of sentencing, to dismiss with prejudice the Indictment as to Defendant WILSON PERSHING STEVENSON III.

(b)     Not to File Additional Charges:

The United States Attorney's Office for the Eastern District of Washington agrees not to bring any additional charges against Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in the Indictment, unless Defendant breaches this Plea Agreement any time before sentencing.

8.     United States Sentencing Guideline Calculations:

Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG") are applicable to this case and that the Court will

determine Defendant's applicable sentencing guideline range at the time of sentencing.

       (a)    Base Offense Level:

The parties agree and stipulate that Defendant's Base Offense Level is 7. *See* USSG §§ 2B1.1(a); 8C2.3.

       (b)    Specific Offense Characteristics:

The parties agree and stipulate that Defendant's Base Offense Level is increased 12-levels for a loss greater than $250,000 but less than $550,000 pursuant to USSG § 2B1.1(b)(1)(G).

The parties have no agreement whether any other specific offense characteristics are applicable. The United States and Defendant may argue for or against any adjustments and/or enhancements under the USSG noted in the Presentence Investigation Report.

The United States and Defendant agree that pursuant to U.S.S.G. § 8C2.4, the base fine is the pecuniary gain to Defendant from the offense, or $493,865. The United States and Defendant further agree that the culpability score for the Defendant is 3.

    9.    Criminal Fine:

The United States and Defendant agree that the guideline fine range for Defendant is $293,619 to $592,439. The United States and Defendant agree to recommend that the Court impose no additional criminal fine.

    10.    Restitution:

The parties agree restitution is required pursuant to 18 U.S.C. §§ 3663(a), 3663A, and 3664. Further, pursuant to 18 U.S.C. § 3663(a)(3) and 3663A(a)(3), the Defendant voluntarily agrees to pay the agreed upon restitution amount in exchange for the United States not bringing additional potential charges, regardless of whether counts of the Indictment dealing with such losses will be dismissed as part of this Plea Agreement. With respect to restitution, the parties agree to the following:

(a)     Restitution Amount

The parties agree that the Court should order Defendant to pay restitution to the Small Business Administration (SBA) in the in the total amount of $493,865.

The parties agree that Defendant shall deposit the full restitution amount of $493,865 plus the $400 special assessment in the Court Registry within 30 days of the entry of this plea agreement. Any interest accrued on the funds deposited in the Court Registry shall be remitted to SBA along with the principal balance in full payment of the Defendant's restitution obligation at sentencing.

The parties agree that the following subparagraphs (b) and (c) shall only apply if Defendant fails to deposit the restitution funds with the Court Registry within 30 days as agreed:

(b)     Treasury Offset Program and Collection

Defendant understands the Treasury Offset Program (TOP) collects delinquent debts owed to federal agencies. If applicable, the TOP may take part or all of Defendant's federal tax refund, federal retirement benefits, or other federal benefits and apply these monies to Defendant's restitution obligations. *See* 26 U.S.C. § 6402(d); 31 U.S.C. § 3720A; 31 U.S.C. § 3716.

Defendant also understands the United States may, notwithstanding the Court-imposed payment schedule, pursue other avenues to ensure the restitution obligation is satisfied, including, but not limited to, garnishment of available funds, wages, or assets. *See* 18 U.S.C. §§ 3572, 3613, and 3664(m). Nothing in this acknowledgment shall be construed to limit Defendant's ability to assert any specifically identified exemptions as provided by law, except as set forth in this Plea Agreement.

(c)     Obligations, Authorizations, and Notifications

The Defendant agrees to truthfully complete the Financial Disclosure Statement that will be provided by the earlier of 30 days from Defendant's signature on this plea agreement or the date of the Defendant's entry of a guilty plea, sign it under penalty of perjury and provide it to both the United States Attorney's Office and the United

States Probation Office.  The parties agree that Defendant's failure to timely and accurately complete and sign the Financial Disclosure Statement, and any update thereto, may, in addition to any other penalty or remedy, constitute Defendant's failure to accept responsibility under U.S.S.G §3E1.1.

Defendant expressly authorizes the United States Attorney's Office to obtain a credit report on Defendant upon the signing of this Plea Agreement. Until the fine or restitution order is paid in full, Defendant agrees to provide waivers, consents or releases requested by the United States Attorney's Office to access records to verify the financial information.

Defendant agrees to notify the Financial Litigation Unit of the United States Attorney's Office before Defendant transfers any interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by Defendant, including any interest held or owned under any name, including trusts, partnerships and corporations. Further, pursuant to 18 U.S.C. § 3664(k), Defendant shall notify the court and the United States Attorney's Office within a reasonable period of time, but no later than 10 days, of any material change in Defendant's economic circumstances that might affect defendant's ability to pay restitution, including, but not limited to, new or changed employment, increases in income, inheritances, monetary gifts or any other acquisition of assets or money.

Until the fine or restitution order is paid in full, Defendant agrees to disclose all assets in which the Defendant has any interest or over which Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or third party.

Pursuant to 18 U.S.C. § 3612(b)(F) Defendant understands and agrees that until a fine or restitution order is paid in full, Defendant must notify the United States Attorney's Office of any change in the mailing address or residence address within 30 days of the change.

11.    <u>Probation</u>:

The parties agree to recommend that, because restitution shall be paid in full at or before sentencing and because Defendant is no longer a going business concern, the Court need not impose a term of probation.  U.S.S.G. § 8D1.1.

12.     Mandatory Special Penalty Assessment:

Defendant agrees to pay the $400 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington.  *See* 18 U.S.C. § 3013.

13.     Additional Violations of Law Can Void Plea Agreement:

The parties agree that the United States may at its option and upon written notice to Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, before sentencing, Defendant is charged or convicted of any criminal offense whatsoever or if Defendant tests positive for any controlled substance.

14.     Hyde Amendment Waiver

The Defendant waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

15.     Waiver of Appeal

In return for the concessions that the United States has made in this Plea Agreement, Defendant agrees to waive Defendant's right to appeal Defendant's conviction and sentence.

Defendant expressly waives Defendant's right to appeal any fine, term of probation, or restitution order imposed by the Court.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

16.     Withdrawal or Vacatur of Defendant's Plea

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

      a.      The United States' obligations under this Plea Agreement shall become null and void;

      b.      the United States may prosecute Defendant on all available charges;

      c.      The United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

      d.      the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and/or defenses Defendant might have to the United States' decisions to seek, reinstate, or reinitiate charges if a count of conviction is withdrawn, set aside, vacated, reversed, or dismissed, including any claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time, including but not limited to, alleged violations of any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

17.    <u>Integration Clause:</u>

The parties acknowledge that this document constitutes the entire Plea Agreement between the parties, and no other promises, agreements, or conditions exist between the parties concerning this case's resolution. This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities. The parties agree that this agreement cannot be modified except in writing that is signed by the United States and Defendant.

<u>Approval and Signature</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Vanessa R. Waldref
United States Attorney

_____     9/27/2024
Dan Fruchter                         Date
Assistant United States Attorney

_____     9/27/2024
Tyler H.L. Tornabene                 Date
Assistant United States Attorney


I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this Plea Agreement. I have also consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

_____     8/27/2024

Plea Agreement- 20 of 21

1   Wilson P. Stevenson, III                          Date
2   Corporate Representative for BNL Technical Solutions, LLC

3   I have read this Plea Agreement and have discussed the contents of the agreement

4   with my client. The Plea Agreement accurately and completely sets forth the entirety

5   of the agreement between the parties. I concur in my client's decision to plead guilty

6   as set forth in the Plea Agreement. There is no legal reason why the Court should not

7   accept Defendant's plea of guilty.

8
9                                                          8/12/24
10  Ed Yarbrough                                      Date
11  Jonathan P. Farmer
    Scott Johnson
12  Attorneys for Defendant

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plea Agreement- 21 of 21